IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ROCK HILL DIVISION

| | |
|---|---|
| MICHAEL GORDON, | ) Civil Action No. 3:07-0992-CMC-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) **REPORT AND RECOMMENDATION** |
| FORT MILL FORD, INC., AND | ) |
| SONIC AUTOMOTIVE, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

  Plaintiff, Michael Gordon ("Gordon") filed this action on April 12, 2007.  He alleges claims under 42 U.S.C. § 1981 ("1981")[1] and under South Carolina law.[2]  Defendants are Fort Mill Ford, Inc. ("Fort Mill Ford") and Sonic Automotive, Inc. ("Sonic").  On June 3, 2008, Defendants filed a motion for summary judgment.  Gordon filed a response on June 23, 2008 and Defendants filed a reply on July 2, 2008.

## SUMMARY JUDGMENT STANDARD

  When no genuine issue of any material fact exists, summary judgment is appropriate.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party.  Id.  Courts take special care when considering summary judgment in employment discrimination cases because states of

---

[1]Pretrial matters in this case were referred to the undersigned pursuant to Local Civil Rule 73.02(B)(2)(g) DSC.  Because this is a dispositive motion, this report and recommendation is entered for review by the court.

[2]In his complaint, Plaintiff also asserted claims under Title VII.  He no longer pursues these claims.  See Plaintiff's Opp. Mem. at n. 1.

mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits (see Fed. R. Civ. P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir.

2

1993) and <u>DeLeon v. St. Joseph Hospital, Inc.</u>, 871 F.2d 1229, 1233 (4th Cir. 1989). Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. <u>Martin v. John W. Stone Oil Distrib., Inc.</u>, 819 F.2d 547 (5th Cir. 1987) and <u>Evans v. Technologies Applications & Servs. Co.</u>, 80 F.3d 954 (4th Cir. 1996).

## **FACTS**

1.    Sonic is a publicly-traded Delaware corporation. It maintains its principal offices in Charlotte, North Carolina. It is the parent or holding company for approximately 140 automobile dealerships in 15 states. Evelyn Slaybaugh[3] ("Slaybaugh") Aff., Para. 7.

2.    Fort Mill Ford is a corporation organized under the laws of the state of South Carolina and does business in Fort Mill, South Carolina. It is one of Sonic's subsidiary corporations/dealerships. Slaybaugh Aff., Para. 5; Answer, Para. 6.

3.    In May 2003, Gordon, an African-American male, was hired by then-General Manager, Bunky Gandy ("Gandy") to serve as a Floor Manager at Fort Mill Ford. Gordon Dep. 32-35, Complaint, Para. 5.

4.    A Floor Manager is also known as a "team leader." Gordon was in charge of a team of salespeople varying in number from eight to twelve. Gordon Dep. 47-48.

5.    In approximately October 2003, Fort Mill Ford hired Cornell McGee ("McGee"), a white male, to serve as a Finance Director. McGee served in that capacity for approximately eight or nine months, leaving in approximately June 2004. McGee Dep. 67.

---

[3]Slaybaugh is the Director of Associate Development for Sonic's Southeast Division. Slaybaugh Aff., Para. 2.

6.   From November 2003 to June 2004,[4] McGee joked around with Gordon privately in a manner that Gordon thought was racially motivated and unprofessional.  McGee found cartoons in the newspaper depicting characters with wild–looking hair and referred to those characters as having a "nappy head."  This conduct occurred once or twice a week during that time period.  Gordon let McGee know he did not appreciate the "nappy head" jokes, but McGee persisted.  McGee made remarks to Gordon's salespeople (concerning sales deals) such as "[your] stupid manager [Gordon] should have handled this" or "if you had a better manager he would be on top of this."  Gordon Dep. 68-73, 75-76.

7.   Sonic maintains a telephone hotline through which employees of Sonic and its subsidiaries are able to report acts of discrimination.  Slaybaugh states that Gordon signed a form indicating that he was aware of the hotline.  Slaybaugh Aff., Para. 32.

8.   Gordon reported the comments to his supervisor at the time, Gandy.  He did not report McGee's alleged "nappy head" comments to the hotline.  Gordon Dep. 72-75, 81, 90.

9.   From June to November 2004 (a period in which McGee did not work at Fort Mill Ford), Gordon states that there was peace in the land (meaning no racial hostility).  See Gordon Dep. 95, 106.

10.  In approximately September 2004, McGee came back to Fort Mill Ford as its general manager.  McGee Dep. 8.

11.  After having a good month of sales in December 2004, McGee took his managers out to a restaurant for dinner in January 2005.  During the dinner, McGee made a number of racially inappropriate and offensive comments to the Caucasian wife of Fort Mill Ford's

---

[4]Gandy was Gordon's supervisor during this time period.

4

African-American New Car Sales Manager, Tim Henderson ("Henderson").[5]  See Gordon Dep. 172-177;[6] Henderson Dep. 23-24.

12.     After dinner, McGee walked out and saw Henderson standing at the valet station.  McGee asked Henderson to get his car in a manner Henderson found offensive and degrading to him as an African-American.  Henderson Dep. 26, see Gordon Dep. 172-176.

13.     Henderson made several calls to the Sonic hotline about the incidents.  At the time someone from the hotline finally called back, Henderson had spoken with Sonic's Regional Vice President, Arthur "Mickey" Mills Joy ("Joy"), and a meeting was set up with Joy, McGee, Henderson, and Henderson's wife.  Henderson Dep. 29-32.

14.     McGee received an employee warning notice from Joy for the valet incident.  McGee Dep. 36-37. Joy Dep. 36, 43.

15.     Later in January 2005, Gordon arrived at work and found photocopies of a gorilla taped up at various locations within the dealership.  He states that some of the photocopies had his name written at the bottom and some had the eyes cut out so they could be used as masks.  Gordon Dep. 108-111, 114.

16.     Gordon did not know who placed the pictures, but claims that McGee endorsed the act because McGee held up one of the pictures and laughed.  Gordon threw the pictures into the trash.  Gordon Dep. 119-120, 122.

---

[5]Henderson testified that McGee stated words to the effect of "once you go black, you never go back.  I guess it's so, y'all have six kids," and made another comment about an African-American's manhood.  Henderson Dep. 23.

[6]Gordon claims that during the dessert course, McGee dipped chocolate into vanilla mousse and stated to the Hendersons that "I understand once you go dark, you never go back."  Gordon Dep. 172. Henderson does not remember hearing that comment.  Henderson Dep. 25.

17. Gordon told McGee that "this is below low" and "you're the general manager now. You need to act accordingly." He also told McGee that McGee should know better having been raised in a town with racial problems (apparently the two had prior discussions about McGee having encountered racism growing up). He claims that McGee did not respond and just walked away. Gordon Dep. 121-122.

18. Approximately one day later, Joy was visiting Fort Mill Ford to continue training McGee as a general manager. Gordon states that he "let [Joy] have it" about the incident and Joy responded that he would talk to McGee. Later, Joy told Gordon "I took care of it. It's going to be handled." Gordon Dep. 125-126.

19. In late January 2005, Gordon came to work to find approximately seven photocopies of the green animated character Shrek (with Gordon's name on the picture) taped up at various locations within the dealership. Gordon does not know who was responsible. Gordon Dep. 128-130.

20. Gordon spoke with Joy, who met with McGee the day after the incident. After meeting with McGee, Joy told Gordon "this will never happen again." Gordon Dep. 131-132.

21. Sometime in March or April 2005, Gordon complained to Joy about McGee singling out Gordon's team members with comments concerning their lack of product knowledge, tardiness, and their lack of knowledge of how to close a deal. Joy's response was that Gordon's team was making him money. Gordon Dep. 150. Gordon also complained to Joy at an April 2005 meeting about issues of racism concerning a transfer for Pat Jefferson ("Jefferson"). See Gordon Dep. 91, 152.

22. On June 11, 2005, Gordon was terminated. Complaint, Para. 10.

6

23.    There were two floor managers, Gordon and Johnny Webb ("Webb"), at the time Gordon was terminated.   McGee considered firing both team leaders, but later decided to terminate Gordon and not terminate Webb.  McGee Dep. 26, <u>see</u> <u>also</u> Carey Crockett Dep. 56.

24.    Paul Adkins ("Adkins"), Fort Mill Ford's General Sales Manager (<u>see</u> Joy Dep. 28), stated that Gordon's team always outperformed Webb's team.  He stated that he told McGee that he should keep Gordon and let Webb go because of the way the teams performed.  Adkins Dep. 13-14.  Carey Crockett ("Crockett"), Fort Mill Ford's Used Car Manager, stated that Webb was not as good a closer as Gordon and that his team production was probably ten percent lower than Gordon's team production.  Crockett Dep. 56.

## DISCUSSION

Plaintiff alleges claims under § 1981 and South Carolina state law.  Sonic asserts that it cannot be held liable under § 1981 because it was not Gordon's employer.  Defendants contend that Plaintiff cannot show that his rights were violated under § 1981 or South Carolina law.

A.    <u>Sonic</u>

Gordon claims that he has offered sufficient evidence of common management, interrelation of operations, common ownership, and centralized control by Sonic over Fort Mill Ford's labor relations to show that Sonic was his employer.  Sonic contends that it cannot be held liable under § 1981 because it did not employ Gordon and Gordon has not shown that Sonic is essentially or substantially identical to its subsidiary (Fort Mill Ford) such that it should be held liable under an integrated employer theory.

Gordon specifically claims that Sonic is his employer based on information discussed below. He claims that Fort Mill Ford and Chrysler Dodge Jeep (another Sonic subsidiary) employees often met jointly for sales training at which time general sales issues were discussed and Sonic films were

shown. Gordon Dep. 58. Joy was involved in developing the budgets for the individual stores and Sonic's Regional Comptroller met with Joy and the dealerships' business managers and office managers. Joy Dep. 13. Along with the General Manager, Joy could deny products that were offered to a dealership and Sonic set guidelines for dealerships to accept or decline products. Joy Dep. 15. Joy had the responsibility of hiring and firing the general manager (but no other Fort Mill Ford employees). Joy Dep. 17. Darren Kendall, Sonic's Used Car Director, had input at Fort Mill Ford concerning contracts and provided weekly feedback and counseling to Crockett. Larry Beasley, a Sonic employee who worked with corporate training, was housed at the Fort Mill office. Crockett Dep. 21-22. Sonic's Regional Comptroller also had offices at Fort Mill Ford. Joy Dep. 22. Monthly meetings conducted by Joy covered issues such as forecasts, departmental productivity, strategy, and goals. See Joy Dep. 24-26; Crockett Dep. 25. Benchmarks were set by Sonic based on goals submitted by the dealership's general manager. Joy Dep. 19. Sonic's Employee Handbook was disseminated at Fort Mill Ford. The handbook required employees to report harassment to the Comptroller or General Manager of the dealership or to Sonic's Director of Human Resources at the corporate office. Crockett Dep., Ex. 1 (Sonic Employee Handbook), p. 9.

The parties agree that whether Sonic is Gordon's employer for purposes of his § 1981 claims should be determined pursuant to the standard set out in Johnson v. Flowers Indus., Inc., 814 F.2d 978 (4th Cir.1987). Gordon, however, argues that the Court should not mechanically apply the integrated test but should consider the evidence he has offered regarding common management, interrelation of operations, common ownership, and centralized control by Sonic over Fort Mill Ford's labor relations.

The integrated employer doctrine provides that companies that are interrelated can constitute a single employer for liability purposes. See Hukill v. Auto Care, Inc., 192 F.3d 437, 442 (4th Cir.

8

1999). The Fourth Circuit has not specifically adopted a test to apply in these situations. <u>Johnson</u>, 814 F.2d at 981 (declining to adopt a mechanical approach but stating that the relevant inquiry is whether there is "parent domination" of the subsidiary); <u>Hukill</u>, 192 F.3d at 442, n. 7 (noting that the <u>Johnson</u> court declined to adopt the four factor "integrated employer test). The <u>Hukill</u> court, however, applied four factors to determine whether entities were an "integrated employer": (1) common management; (2) interrelation between operations; (3) centralized control of labor relations; and (4) degree of common ownership/financial control. <u>Hukill</u>, 192 F.3d at 442. No single factor is conclusive, but the most critical factor is the control of labor operations. <u>See</u> <u>Hukill</u>, 192 F.3d at 442 (citing <u>Schweitzer v. Advanced Telemarketing Corp.</u>, 104 F.3d 761, 764 (5th Cir.1997)). The Fourth Circuit stated that the "'integrated employer' test instructs a court to determine '[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination.'" <u>Id.</u> at 444 (quoting <u>Trevino v. Celanese Corp.</u>, 701 F.2d 397, 404 (5th Cir. 1983).

Under the first factor (common management), there is overlap between the officers and directors of the two companies. Slaybaugh states, however, that "none of these officers or directors are responsible for or participate in Fort Mill Ford's day to day decisions. All of the day-to-day decisions rest with either Fort Mill Ford's general manager or its accounting controller." Slaybaugh Aff., Para. 26. Although Joy and other Sonic employees met with Fort Mill Ford employees and reviewed Sonic policies, Gordon has not shown that the day-to-day operations were controlled by Sonic. Gordon argues that certain policies were set by Sonic, but he admits that Fort Mill Ford's management was responsible for implementing and administering those policies. Gordon Dep. 183.

Under the second factor (interrelation between operations), the two companies observed corporate formalities. Although Gordon asserts that two Sonic employees had offices at Fort Mill Ford, Sonic's headquarters is in Mecklenburg County, North Carolina and Fort Mill Ford maintains

its principal office at its dealership in Fort Mill, South Carolina, where its employees are based. Slaybaugh Aff., Para. 7 and Todd Grubb ("Grubb")[7] Aff., Para. 9. Sonic and Fort Mill Ford maintain independent telephone and facsimile numbers and switchboards. Slaybaugh Aff., Para. 9; Grubb Aff., Para. 10. Sonic does not share its employees with Fort Mill Ford, and Fort Mill Ford does not share its employees with Sonic. Slaybaugh Aff., Para. 10; Grubb Aff., Para. 11. Sonic and Fort Mill Ford maintain separate bank accounts, corporate receipts, credit lines, and payroll departments and payroll administrators. Slaybaugh Aff., Para. 11; Grubb Aff., Para. 12. All Sonic employees are paid with funds from Sonic accounts, and all Fort Mill Ford employees are paid with funds from a separate, Fort Mill Ford, account. Slaybaugh Aff., Para. 12; Grubb Aff., Para. 13. Gordon admits that his paychecks came from Fort Mill Ford. Gordon Dep. 241, 243. Further, Gordon has not shown that Sonic dominates Fort Mill Ford's operations as there is no evidence that the companies commingled funds or that Fort Mill Ford was severely undercapitalized. See Harris v. Palmetto Tile, Inc., 835 F. Supp. 263, 268 (D.S.C. 1993); Wauben v. Protego (USA), Inc., C.A. No. 2:05-2780-PMD-RSC, 2007 WL 775614, *7 (D.S.C. March 9, 2007)(unpublished).

Analysis of the third and most important factor (centralized control of labor relations) reveals that although there is some overlap between the companies, Sonic does not exercise centralized control over Fort Mill Ford's labor relations. Gordon appears to assert that Sonic had centralized control over labor relations because Sonic had a toll-free hotline to which Fort Mill Ford employees were to report concerns or complaints, the Sonic Employee Handbook was furnished to all Fort Mill Ford employees, and Fort Mill Ford managers received transfer authorizations (to other dealerships) from Sonic employees. He testified, however, that his compensation decisions, work schedule,

---

[7]Grubb has been the general manager of Fort Mill Ford since November 2007. Grubb Aff., Para. 2.

reviews, and evaluations all came directly from his general manager at Fort Mill Ford.  Gordon Dep. 195-196.  Slaybaugh states that Sonic maintains its personnel department independent of Fort Mill Ford.  Slaybaugh Aff., Para. 10. Further, Gordon fails to show that Sonic (or Joy) made the final employment decision to terminate him.  Joy stated that although he and Joy discussed the need to reduce expenses by reducing the number of sales managers, he stated that "it was up to [McGee] to review the personnel involved and get back and tell me his decision."  Joy Dep. 61.

There is no dispute that there is common ownership under the fourth factor as Sonic owns Fort Mill Ford.  This fact alone, however, is of limited value because ownership merely reflects the parent-subsidiary relationship.   The fact of a parent-subsidiary relationship between the two companies is not sufficient, as a matter of law, to impute liability to Sonic for the alleged discriminatory actions of its subsidiary Fort Mill Ford.  See Hukill at 442; Glunt v. GES Exposition Servs., Inc., 123 F. Supp. 2d 847, 875 (D.Md. 2000).

Based on these four factors, there is simply not enough evidence to show that Sonic should be held liable as Gordon's employer for the alleged acts of Fort Mill Ford.  The doctrine of limited liability of a parent corporation remains the rule.   "In determining when a parent crosses this line, the courts have found parent corporations to be employers only in extraordinary circumstances." Johnson, 814 F.2d at 981.[8]

_____

[8]In his opposition memorandum, Gordon appears to assert a theory of vicarious liability. This does not appear to be properly before the Court, as he did not allege this in the Complaint.  Further, Gordon has offered no evidence that Sonic authorized, ratified, or approved of any intentional discriminatory conduct by McGee or any other of Defendants' employees. See Yates v. Hagerstown Lodge No. 212, 878 F. Supp. 788 (D.Md. 1995)

B.     § 1981 Claims

   Gordon alleges that his rights were violated under § 1981 because he was terminated based on his race, he was subjected to racial harassment, and he was terminated in retaliation for reporting protected conduct.[9]

   1.  Discriminatory Termination

   Gordon alleges that he has direct evidence that he was terminated based on his race. He also claims that he has established a prima facie case of discrimination under the McDonnell Douglas framework.

   A plaintiff can establish a discriminatory discharge claim in two ways. First, under Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), an employee can offer sufficient direct or circumstantial evidence of impermissible racial motive for the discharge. If a plaintiff has presented "direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision," he is under no obligation to make out a prima facie case. Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 318 & n. 4 (4th Cir. 2005). Alternatively, an employee can employ the burden shifting scheme set out in McDonnell Douglas v. Green, 411 U.S. 792 (1973), as discussed below.

   Gordon argues that he has presented direct evidence of racial motive based on statements to him from Jefferson and Gandy. Defendants contend that Gordon fails to establish a claim using direct evidence because he has only offered inadmissible hearsay evidence.

_____

 [9]Gordon also discusses instances of disparate treatment where African-Americans were allegedly treated differently than their white counterparts concerning bonuses and discipline. These claims are not properly before the court, as they were not raised in the Complaint. Further, there is no evidence that Plaintiff was subjected to disparate treatment that constituted an adverse employment action (other than his termination - discussed below).

Gordon fails to establish his claim of discriminatory termination based on direct evidence because he has only offered inadmissible hearsay evidence to support his claim.  He testified that Jefferson told him she overheard McGee use the word "nigger" in approximately May 2005 and she believed that McGee was referring to Gordon.   Gordon Dep. 217-218.  Gordon also claims that Gandy told him that McGee had issues with race and people of color (see Gordon Dep. 84-85).  Additionally, Gordon claims that a third person told him that other Fort Mill Ford employees referred to him as "nigger boss." Gordon Dep. 116-117.  He has, however, presented no admissible testimony from Jefferson, Gandy, or the other person to support his assertions.

Further, Gordon has not established that the alleged comments by Jefferson and Gandy related to the decision to terminate him.  In establishing evidence of discrimination, derogatory remarks may constitute direct evidence, as long as the remarks were related to the employment decision in question and were not stray or isolated.  Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir. 1999), abrogated on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003). Gordon's evidence must clearly indicate a discriminatory motive and illustrate a nexus between that motive and the adverse employment action. Id.

Under the McDonnell Douglas framework, an employee can establish a prima facie case of discrimination by offering proof that:

(1)     he is a member of a protected class;

(2)     he was qualified for his job and his job performance was satisfactory;

(3)     he was subjected to an adverse employment action; and

(4)     the alleged adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination.

13

See Gairola v. Commonwealth of Virginia Dep't of General Serv., 753 F.2d 1281, 1286 (4th Cir.1985); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir.), cert. denied, 516 U.S. 870 (1995); McDonnell Douglas, 411 U.S. at 802.[10]  McDonnell Douglas provides that, once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory basis for the challenged employment action.  McDonnell Douglas, 411 U.S. at 802.  If the employer provides the required evidence of a non-discriminatory reason for the action, the plaintiff must then show that the proffered reasons were not the true reasons for the employment action, but were a pretext for discrimination.  Id. at 804; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

(a)      Prima Facie Case

Defendants contend that Gordon fails to establish his prima facie case because he has not met the fourth prong, that his termination occurred under circumstances that support an inference of unlawful discrimination.  Gordon argues that he has established the fourth prong of his prima facie case because African-Americans at Fort Mill Ford were disciplined differently than their white counterparts; McGee treated African-Americans differently with respect to bonuses than he did with white employees;[11] a lower-performing, white employee was kept on the payroll at the time Gordon was terminated; McGee never considered reducing Gordon's pay plan

---

[10]Gordon has utilized a framework for a disparate discipline case (see Plaintiff's Opp. Mem. at 29), but this framework does not appear to be applicable here.

[11]Although Gordon testified that he had to intervene on behalf of certain of his salespeople in order for them to receive their bonuses, he admits they eventually received them. See Gordon Dep. 141.  He also discusses disparate discipline of African-American employees, but has not alleged that he himself was disciplined in a disparate way that constituted an adverse employment action.

14

instead of terminating him; and Gordon was not offered a different position instead of being terminated.

In the light most favorable to Plaintiff, he has established a prima facie case of discriminatory termination because he was terminated, but a lesser-performing white floor manager (Webb) was not terminated (see Adkins Dep. 13-14, Crockett Dep. 56).

        (b)     <u>Legitimate, Non-Discriminatory Reason</u>

Defendants have articulated a legitimate, non-discriminatory reason for terminating Gordon, to save costs at the dealership because the dealership was lagging in service and sales revenues. <u>See</u> Joy Dep. 54, 57-60; McGee Dep. 24; Slaybaugh Aff., Para. 29. Defendants state that Gordon was compensated better than Webb. <u>See</u> Joy Dep. 62, McGee Dep. 24-26, Slaybaugh Aff., Para. 29. Joy states that it made business sense to terminate the higher compensated of the employees to save the dealership as much money as possible, especially since Webb was fully capable of doing both jobs. Joy Dep. 63.

        (c)     <u>Pretext</u>

Gordon appears to argue that he has shown pretext because Defendants kept a lower-performing white employee on the payroll; they never considered reducing his pay plan although it had been changed from time-to-time during the course of his employment as a floor manager; and at the time he was terminated, McGee was advertising for other positions and never offered Gordon any of those positions. He also argues that these alleged actions plus evidence of racial harassment shows pretext.

In the light most favorable to Gordon, there is ample evidence that a jury could conclude that discriminatory reasons more likely motivated Fort Mill Ford to terminate him. Specifically, Gordon has presented evidence that his team was closing more deals than the one headed by Webb (the white

15

floor manager who was not terminated).  He has also presented evidence of a history of alleged racial harassment by McGee, who was the decisionmaker as to his termination.

        2.    <u>Harassment</u>

Gordon alleges that he was subjected to racial harassment by his co-workers at Fort Mill as well as by his manager McGee.  He argues that the totality of the evidence shows that he was racially harassed.

To prevail on a Title VII hostile environment claim based on race, a plaintiff is required to present evidence establishing that "(1) the subject conduct was unwelcome; (2) it was based on the [race] of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." <u>Spicer v. Virginia Dep't of Corrs.</u>, 66 F.3d 705, 710 (4th Cir.1995) (en banc); <u>see</u> <u>also</u> <u>Ocheltree v. Scollon Prods., Inc.</u>, 335 F.3d 325, 331 (4th Cir. 2003) (en banc).

In <u>Burlington Indus., Inc. v. Ellerth</u> 524 U.S. 742 (1998) and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998) the Supreme Court held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by [the employee's] supervisor." <u>Ellerth</u>, 524 U.S. at 765; <u>Faragher</u>, 524 U.S. at 807.  However, when no tangible employment action is taken (such as termination, a demotion, or a transfer), an employer may defend against liability or damages if it established by a preponderance of the evidence: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise." <u>Id.</u>

The alleged harassment from November 2003 to June 2004[12] was by Gordon's coworker (McGee), not his supervisor. Gordon has presented evidence that the "nappy head" comments were unwelcome and were severe and pervasive, as they allegedly occurred one to two times a week during this time period. Defendants claim that Gordon has not shown that these comments were racial. Although the term nappy is not necessarily racial, the comments, in the manner in which they were used and in light of the later alleged harassment by McGee, were arguably based on Gordon's race. Defendants claim that liability should not be imputed because Gordon never reported the comments to the Sonic hotline and/or because he was satisfied with the result of talking with Gandy. In the light most favorable to Plaintiff, however, this claim should go forward because Gordon reported the comments to the General Manager Gandy and the comments continued.

The alleged harassment beginning in January 2005 occurred during the time McGee was Gordon's supervisor. The parties do not appear to dispute that the harassment was unwelcome. In the light most favorable to Plaintiff, this claim should go forward because, looking at the totality[13]

---

[12]Defendants, in their motion for summary judgment, argue that McGee's conduct as a financial manager (November 2003 to June 2004) cannot form the basis of Plaintiff's Title VII claims since those claims were barred by both the 180 and 300 day statutes of limitations (42 U.S.C. §2000(3)(5)). As Plaintiff has abandoned his Title VII claims, he brings his harassment claim only under § 1981. In Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369 (2004), the Supreme Court held that claims arising under the 1991 amendments to § 1981 are governed by the four-year federal statute of limitations set forth in 28 U.S.C. § 1658. Section 1981 claims based upon conduct occurring after the formation of an employment contract, including hostile work environment claims, arise under the 1991 amendments. Id. at 374; see also James v. Circuit City Stores, Inc., 370 F.3d 417 (4th Cir. 2004).

[13]There were other incidents of alleged harassment by McGee and others at Fort Mill Ford. Henderson stated that on one occasion (no date given) another dealership had an ad with a gorilla, ape, or monkey and McGee "made a gesture that [Gordon] was in the newspaper." Henderson Dep. 40-41. Adkins stated that he and Henderson (after Henderson transferred to Arnold Palmer Cadillac) were going to a training session in Atlanta when McGee learned that Adkins and Henderson were going to drive one of the company Cadillacs, McGee told Adkins "Do me a favor and sit in the back (continued...)

of the circumstances,[14] the harassment was severe and pervasive, it was based on Gordon's race, and is imputable to Fort Mill Ford because the alleged harassment was performed by Gordon's supervisor.  Defendants argue that the harassment was not severe or pervasive because it was sporadic.  In January 2005 alone, however, Gordon was exposed to McGee's racial comments at the restaurant, was subjected to the gorilla pictures, and was subjected to the Shrek pictures.  "To suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme."  White v. BFI Waste Servs., LLC, 375 F.3d 288, 298 (4th Cir.2004) (quoting Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001)).  McGee insinuated that Gordon did not have good computer skills (which Gordon admits he did not have) (Gordon Dep. 153) and on an unspecified date asked McGee if "black folks have a hard time trying to pick up with technology."  Gordon Dep. 219. In the light most favorable to Gordon, he has shown that the alleged harassment should be imputed to his employer because he complained of the conduct to both his General Manager (McGee) and to Sonic (Joy).  Despite this, harassment continued.  There is a question of fact as to whether Gordon's employer should be held vicariously liable for the alleged conduct.  Although Gordon testified that he did not know who put up the gorilla or Shrek pictures,  he stated that McGee laughed about the gorilla pictures.  There is no indication that McGee talked to his employees or did anything about the alleged harassment.

---

[13](...continued)
seat" and smirked.  Adkins Dep. 17-18.  Gordon states that McGee told him that "we're a little concerned about you having a predominant black team."  Gordon Dep. 147.

[14]In evaluating whether harassment is severe and pervasive so as to make it actionable under Title VII, the court "must examine the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir.1996) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993))

        3.    <u>Retaliation</u>

Gordon alleges that he was terminated in retaliation for reporting discrimination. Defendants contend that Gordon fails to establish a prima facie case of retaliation.

To establish a prima facie case of retaliation under Title VII, an employee must demonstrate that:

    1)    the employee engaged in protected activity;[15]

    2)    the employer took some adverse employment action against the employee; and

    3)    a causal connection existed between the protected activity and the adverse action.

<u>See</u> <u>Haulbrook v. Michelin North America, Inc.</u>, 252 F.3d. 696, 706 (4th Cir. 2001)(ADA); <u>Causey v. Balog</u>, 162 F.3d 795, 803 (4th Cir. 1998)(ADEA and Title VII); <u>Carter v. Ball</u>, 33 F.3d 450, 460 (4th Cir. 1994)(Title VII). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for the adverse action. <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981). If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual. <u>Reeves</u>, 530 U.S. at 147.

        a.    <u>Prima Facie Case</u>

Defendants contend that Gordon fails to establish a causal connection between the protected activity and his termination because approximately four months passed

---

[15]Under Title VII, a plaintiff need not have filed a formal complaint with the Equal Employment Opportunity Commission or a state deferral agency to engage in a protected activity. Complaints to supervisory or management employees concerning harassment or discriminatory treatment as well as informal complaints, filing of internal grievances, and complaints to an agency are included within the definition of protected activity. <u>Warren v. Halstead Indus., Inc.</u>, 802 F.2d 746, <u>cert. denied</u>, 487 U.S. 1218 (1988) and <u>Mitchell v. Baldrige</u>, 759 F.2d 80 (D.C. Cir. 1985).

between the two events.[16]  Gordon appears to argue that he has established the fourth prong of his

prima facie case based on temporal proximity.  He claims that there was not too much passage of

time because he complained about bonuses not being awarded to his salesmen during the interim

period and because he and others met with Joy in April 2005, at which time he complained to Joy

about racial discrimination or harassment.  In the light most favorable to Plaintiff, he has established

the third prong based on temporal proximity and thus has established a prima facie case of retaliation.

> b.    Legitimate, Nondiscriminatory Reason/Pretext

Defendants have articulated a legitimate, nondiscriminatory reason for

Plaintiff's termination (to reduce costs).  As discussed above, in the light most favorable to Gordon

he has presented sufficient evidence for a jury to find pretext.

> C.    State Law Claims

Gordon alleges claims under South Carolina law for negligent infliction of emotional

distress, negligent supervision, and negligent retention.

> 1.    Negligent Infliction of Emotional Distress

Defendants contend that Plaintiff fails to establish a claim for negligent

infliction of emotional distress because he has not shown any physical injury to either himself or a

closely related victim.  See Doe v. Greenville County School Dist., 651 S.E.2d 305, 307 (S.C. 2007)

and Stickland v. Madden, 448 S.E.2d 581, 583-584 (S.C.Ct.App. 1994).  Gordon has not shown a

---

[16]See, e.g., Pascual v. Lowe's Home Ctrs., Inc., 193 Fed. Appx. 229, 232 (4th Cir. 2006)(unpublished)(holding that three to four months between the termination and protected activities is too long to establish a causal connection by temporal proximity alone); Garrett v. Lujan, 799 F. Supp. 198, 202 (D.D.C.1992)(concluding that the passage of nearly a year precluded an inference of causal connection); Parrott v. Cheney, 748 F. Supp. 312 (D.Md.1989) (even the passage of as little as five months between filing EEOC complaint and adverse action may be enough to negate causal connection in a particular factual context), aff'd per curiam, 914 F.2d 248 (4th Cir. 1990).

physical injury to a closely related victim or to himself.  Further, Gordon appears to have abandoned this cause of action, as he does not discuss it in his memorandum in opposition to summary judgment.

    2.    <u>Negligent Retention and Supervision</u>

Plaintiff alleges that he has established claims for negligent retention[17] and negligent supervision[18] because Defendants had knowledge of the discriminatory, hostile, and retaliatory actions of its employees toward him; McGee and Joy failed to stop this conduct; and Defendants retained these employees despite the alleged conduct.  Defendants contend that Plaintiff cannot establish these claims because he has not shown an "intentional harm" from Defendants' alleged actions and he cannot show that his termination was an intended harm because South Carolina is an employment-at-will state and Fort Mill Ford had the ability to terminate Gordon's employment at any time or for any reason (limited by Fort Mill's duty to comply with Title VII and § 1981).  They also argue that Gordon did not allege any emotional harm as to any events preceding his termination and  even if Gordon was embarrassed or humiliated at the time of the gorilla and/or Shrek pictures, he fails to come forward with any recoverable harm.  Gordon does not appear to dispute that he cannot allege termination as the intentional harm, but instead argues that the alleged harassment was the intentional harm.  He claims that he was mentally and emotionally harmed by the harassment and experienced stress, had difficulty sleeping, had a loss of self esteem and

---

[17]An employer may be liable for negligent supervision if the employee intentionally harms another when the employee: (1) is upon the premises of the employer, or is using a chattel of the employer, (2) the employer knows or has reason to know that he has the ability to control his employee, and (3) the employer knows or should know of the necessity and opportunity for exercising such control. <u>Degenhart v. Knights of Columbus</u>, 420 S.E.2d 495, 496 (S.C. 1992).

[18]To prove a claim for negligent retention, a plaintiff must show that his employer had knowledge of its employee's habit of prior wrongdoings, and despite the foreseeability of harm to third parties, failed to terminate that offending employee prior to the time that he caused the plaintiff harm.  <u>See Doe v. ATC, Inc.</u>, 624 S.E.2d 447, 450-1 (S.C.Ct.App. 2005)

self-worth, and had feelings of inadequacy. Gordon, however, fails to dispute Defendants' contention that his claimed harm was tied to his termination, and not to any events preceding his termination. <u>See</u> Gordon Dep. 209-214.[19] Thus, it is recommended that summary judgment be granted as to Gordon's negligent retention and negligent supervision claims.

<u>CONCLUSION</u>

Based on the foregoing, it is recommended that Sonic's motion for summary judgment be granted. It is also recommended that Fort Mill Ford's motion for summary judgment  be denied as to Plaintiff's claims under § 1981 for discriminatory discharge, retaliation, and harassment and be granted as to Plaintiff's remaining claims (Title VII claims and claims under South Carolina law).



Joseph R. McCrorey
United States Magistrate Judge

March 2, 2009
Columbia, South Carolina

---

[19]Gordon testified that as a result of his termination, he suffered from anxiety in that he could not find another management position. He did not seek treatment with any physician, psychologist, or therapist. Gordon stated that he spoke with a couple of his friends who are also lay ministers. <u>See</u> Gordon Dep. 209-213.